**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Steven J. Roy[1]

      v.                                   Civil No. 07-cv-353-PB

William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.[2]

**REPORT AND RECOMMENDATION**

       Before the Court is New Hampshire State Prison("NHSP")

inmate Steven Roy's complaint and addenda thereto (document nos.

---

[1] Liberally construed, Roy's complaint can be read to assert that he is purporting to representing the interests of other inmates as well as himself. Parties to a federal lawsuit cannot be represented by anyone other than themselves or a member of the bar. See 28 U.S.C. § 1654; see also LR 83.2(d) ("Persons who are not members of the bar . . . will be allowed to appear before this court only on their own behalf."); LR 83.6(b) ("Pro se parties must appear personally . . . . A pro se party may not authorize another person who is not a member of the bar of this court to appear on his or her behalf."). For that reason, Roy, proceeding pro se and not as a member of the bar of this Court, cannot represent anyone but himself in this action. I will construe this complaint as filed solely by plaintiff on his own behalf.

[2] In addition to William Wrenn, Roy also names New Hampshire State Prison ("NHSP") Warden Richard Gerry, former NHSP Warden Bruce Cattell, NHSP Medical Director Dr. Robert McLeod, NHSP Dental Director Dr. Karen Anderson, NHSP Unit Manager Lucie Bilodeau, and NHSP Lt. Tony Kingsbury as defendants to this action.

1, 13, 16 & 17),[3] filed pursuant to 42 U.S.C. § 1983.  The matter
is before me for preliminary review to determine whether the
complaint states any claim upon which relief might be granted.
See United States District Court District of New Hampshire Local
Rule ("LR") 4.3(d)(2)(A) (authorizing magistrate judge to
preliminary review pro se prisoner complaints).

Standard of Review

       Under this Court's local rules, when an incarcerated
plaintiff commences an action pro se and in forma pauperis, the
magistrate judge is directed to conduct a preliminary review.  LR
4.3(d)(2).  In conducting the preliminary review, the Court
construes pro se pleadings liberally, however inartfully pleaded.
See Erickson v. Pardus, ___ U.S. ___, 127 S. Ct. 2197, 2200
(2007) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and
Haines v. Kerner, 404 U.S. 519, 520-21 (1972) to construe pro se
pleadings liberally in favor of the pro se party).  "The policy
behind affording pro se plaintiffs liberal interpretation is that
if they present sufficient facts, the court may intuit the
correct cause of action, even if it was imperfectly pled."
Castro v. United States, 540 U.S. 375, 381 (2003) (noting that

_____

       [3]The complaint and addenda, in the aggregate, will be
considered to be the complaint in this matter for all purposes.

courts may construe pro se pleadings so as to avoid
inappropriately stringent rules and unnecessary dismissals of
claims); <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997).
All of the factual assertions made by a pro se plaintiff and
inferences reasonably drawn therefrom must be accepted as true.
<u>See</u> <u>id.</u>  This review ensures that pro se pleadings are given fair
and meaningful consideration.

Background

A.   <u>Facts Relating to Inadequate Dental Care</u>

On October 10, 2005, Roy had a dental cleaning conducted by
either a dental hygienist/technician, at the NHSP.  Roy alerted
the hygienist/technician to a hole in one of his teeth (tooth
#25[4]).  The hygienist noted the problem and stated that #25 was
in need of dental attention in order to remain viable.

On October 18, 2005, Roy sent an Inmate Request Slip ("IRS")
to the NHSP Dental Department ("Dental") as a reminder that he
needed an appointment to repair tooth #25.  Roy did not hear back
from Dental, and so, on November 13, 2005, he sent an additional
IRS to NHSP Medical Director Dr. McLeod regarding his need for an

---

[4]Roy uses a tooth numbering system that he claims is the
same as that utilized by the dental profession to identify teeth.
For purposes of ease and clarity, I will refer to the teeth by
the numbers Roy has given them.

appointment to repair tooth #25.  On November 15, 2005, Dental

answered Roy's October 18, 2005 IRS, stating that appointments

were not being scheduled until January or February of 2006, and

that Roy would be notified when his "name comes up."  On November

18, 2005, Dental Director Dr. Anderson responded to the November

13, 2005 IRS stating:

> You were put on our waiting list on 10/10[/05].
> Based on current staffing, I project you will have
> an appointment in February.  We will not know when
> it will be until we start booking February.  I am
> not aware this is an urgent problem.  If it is,
> you should attend dental sick call.

Roy sent an additional IRS to Anderson on November 21, 2005,

questioning her assessment of the lack of urgency to have tooth

#25 repaired, as no x-ray of the tooth had been taken.  Anderson

responded on November 28, 2005, by advising Roy to report to sick

call.

On December 2, 2005, Roy reported to sick call to have tooth

#25 re-examined, and to report that one of his molars, tooth #2,

was chipped.  The sick call dentist gave Roy a December 7, 2005,

emergency appointment, stating that #25 needed immediate work

because it was a large cavity in a small tooth.

On December 7, 2005, tooth #25 was filled.  The dentist Roy

saw on that day said that the decay was deep into the tooth, and

4

that Roy's tooth #24 needed a similar repair.  Dr. Anderson was
present on December 7, 2005, and advised Roy that there were no
appointments available for three months.

On February 8, 2006, Roy sent an IRS to Dental stating that
the filling in #25 that had been installed on December 7, 2005,
was loose, and that he therefore needed repairs in teeth #2, #24,
and #25.  On February 13, 2006, Roy received a response stating
that he had been on the filling list since October of 2005, and
that an appointment would be scheduled soon.

On March 2, 2006, Roy received an appointment for April 14,
2006, six months after his initial dental cleaning had identified
the need for dental care, to fix only tooth #2.  On March 6,
2006, however, the loose filling in Roy's tooth #25 fell out.
Additionally, a small filling in tooth #24 had fallen out.  Roy
began to experience pain in both of these teeth as a result.  Roy
reported to dental sick call on March 6, 2006.  Dr. Anderson
examined Roy, but did not take x-rays, and stated that there was
no decay in either tooth #24 or #25.  Dr. Anderson filled #25,
and stated that #24 was better off without a filling.

The pain in teeth #24 and #25 increased until March 17,
2006, when Roy again went to dental sick call.  The dentist on

5

duty determined that both teeth were dying, and rescinded the appointment that had been scheduled on April 14 for #2, replacing it with an appointment for March 27, 2006 to treat #24 and #25 with root canals.  Roy was told that his appointment for #2 would also be rescheduled, but that only one repair appointment could be pending for an individual inmate at any given time.

On March 27, 2006, Roy had his first of appointments needed to do two root canals, on teeth #24 and #25.  The second appointment was scheduled on June 6, 2006, to complete the root canals.  At the second appointment, the dentist stated that Roy might have problems with the root canal in tooth #25 since there was a "side pocket" in the canal.  The dental technician told Roy that an appointment would be scheduled to repair the chip on #2, which had gotten larger as another piece of the tooth had broken off in May 2006.

On July 14, 2006, Roy went to dental sick call because he had a crown on tooth #4 that was loose and needed to be reglued. Roy reports that since his arrival at the NHSP in 1993, the crown on tooth #4 had been routinely reglued every couple of years. However, during his incarceration, Roy had work done on a crown that was disintegrating on tooth #3.  A composite crown was put

6

in place for tooth #3 which made the crown on tooth #4 come loose more rapidly than it had prior to the placement of the composite crown.  As a result, in 2004 or 2005, the NHSP dentist made a new, inferior, plastic crown for tooth #4, and discarded the porcelain crown that had previously been in place.  However, on July 14, 2006, when Roy reported to sick call for regluing of the loose crown on tooth #4, Dr. Anderson advised Roy that Dental usually does not repair crowns, but instead pulls the tooth.

When Roy pressed Dr. Anderson to reglue the crown rather than pull his tooth, Dr. Anderson refused, stating that a piece of tooth had chipped off inside the crown and that the crown could therefore not be reglued securely.  Roy states that there were no chips on tooth #4, and that there was a tiny piece of metal, perhaps from the pin in his mouth, inside the crown, which he easily removed at his appointment.  Dr. Anderson still refused to fix anything at that time that wasn't painful, bleeding or swollen.  When Roy told her that it was, in fact, painful for him to eat on the side of his mouth where the crown was gone, Dr. Anderson advised him to chew on the other side of his mouth, and did not reglue the crown.  Dr. Anderson advised Roy that he would receive an appointment in October 2006.

7

On July 17, 2006, Roy sent Dr. Anderson an IRS, appealing to her to reconsider her refusal to treat teeth #2 and #4.  The IRS stated:

> I am appealing the DENIAL of treatment I received on 7/14/2006.  I feel that the attached chronology brings into sharp relief the neglect that I have suffered in my dental care: What should be routine procedures are delayed until they become emergencies.  My broken upper-right molar has been awaiting repair since 12/2/2005; but when it becomes an emergency (due to lack of timely treatment), you will not doubt advise its extraction.  My expensive crown was replaced with plastic, and now that only a plastic crown is at issue, it can wait until the tooth is rotted beyond repair.  Waking each morning with the stink and taste of rotting teeth in my mouth only serves to remind me of this cruel treatment.  I request you reconsider neglect of my dental health.

(emphasis in original).  Dr. Anderson responded:

> You have had 3 scheduled appointments since 12/2/05 and have been seen at sick call 3 times after that date.  You lost your porcelain crown, we are not responsible.  The prognosis for #4 is questionable, but we will try.

Roy reports that he has not received any reparative treatment for tooth #4 since July 14, 2006.

On July 24, 2006, tooth #25 broke off at the gumline.  Roy glued tooth #25 back on himself, and also glued the crown back onto #4 himself, as he believed, based on the experiences he had already had with Dental, that Dental would not repair the teeth.

8

On August 7, 2006, tooth #25 disintegrated, the crown on
tooth #4 came off, and the composite crown held in with a pin
came off of tooth #3.   It appears that Roy again reglued these
crowns himself.   Two days later, on August 9, 2006, an
appointment to fix these teeth was scheduled for October 16,
2006.

Roy had, on August 1, 2006, appealed the denial of adequate
dental care to NHSP Medical Director Dr. Robert McLeod.
Receiving no satisfactory response, on August 22, 2006, Roy filed
a grievance with then-NHSP Warden Bruce Cattell which was never
answered.   On September 27, 2006, Roy sent an IRS to Warden
Cattell following up on his August 22 grievance.   Warden Cattell
answered, confirming that Roy's grievance had been received and
forwarded to Dr. McLeod.   Having received no satisfactory
response to his grievance, on October 5, 2006, Roy filed a
further grievance with New Hampshire Department of Corrections
("DOC") Commissioner William Wrenn.

On October 10, 2006, the crown on tooth #4 again came off,
as did the crown on #3.   Roy kept both crowns, but did not reglue
them at that time.

9

On October 16, 2006, Roy went to his scheduled dentist appointment.  The dentist told Roy that he needed even more dental work than had previously been anticipated.  The dentist examined the damage to teeth #2, #3, and #4, and stated that Roy would have to return for another appointment to have those teeth repaired and to get new crowns.

While the dentist set out to work on teeth #24, #25 and #26 at the October 16, 2006 appointment, due to time constraints, he was unable to repair the teeth, and so he created a three-tooth bridge for teeth #24, #25 (which was missing) and #26, using composite material and three pins to replace tooth #25.  During the appointment, the dentist also advised Roy that tooth #26 also needing additional work because it was decaying.

On October 29, 2006, Roy sent an IRS to Wrenn notifying him that only one out of his four ongoing dental problems had been addressed.  The response to the IRS, written by Deputy DOC Commissioner Greg Crompton, advised Roy to contact Dr. Anderson.

On November 2, 2006, Roy sent an IRS to Dr. Anderson, advising her he still had three outstanding dental problems.  Dr. Anderson responded that Roy was on a waiting list for a dental appointment.  On November 2, 2006, Roy also wrote to Crompton,

asking if Wrenn would step in to correct the problems with dental care at the NHSP.  Crompton responded to Roy that discussions had occurred with Dr. McLeod about the problems with dental care at the NHSP but did not provide further information.

On November 12, 2006, while Roy was flossing his teeth, a filling he had in tooth #5 broke in half.  Roy glued the filling back in himself on November 14, 2006, but it was not secure and came loose again soon afterward.

On November 17, 2006, Dr. McLeod responded to Roy's October 5, 2006 grievance to Commissioner Wrenn.  Dr. McLeod stated that he would direct that a complete dental evaluation of Roy be performed.

On November 21, 2006, Roy received a full dental examination from Dr. Anderson, with x-rays.  At that time, Roy advised her of two loose fillings, one in #5 and one in #13, but neither Anderson nor Roy could make them move at that time.  Roy asked for an appointment to treat all of his outstanding dental problems.  Dr. Anderson told Roy that he was on the waiting list for an appointment, but that appointments were being scheduled nine months out.

On December 5, 2006, the loose filling in tooth #13 broke in two, and one piece of the filling fell out.  Roy filled the resulting hole with glue himself.  The remaining piece came out on December 21, 2006.  Roy again tended to it himself until he went to dental sick call on January 22, 2007.  Roy insisted that he be given a temporary filling, which was done, but no x-ray was taken and the tooth was not drilled.

On January 25, 2007, Roy submitted an IRS requesting a dental cleaning and was scheduled for an appointment on February 26, 2007.  On February 26, both the hygienist and her supervisor advised Roy that teeth #2, #3, and #4 would not be worked on at all during the cleaning, to "avoid stirring up bacteria" because of the extensive decay in those teeth.

On April 9, 2007, the front composite layer of tooth #25 snapped off.  This was the third time that Dental's work on tooth #25 had failed since Roy initially sought treatment for the tooth in October of 2005, as a filling had come out of the tooth on February 8, 2006, two months after it was installed, and the entire tooth snapped off on July 24, 2006, six weeks after a root canal was done on the tooth.

On April 30, 2007, Roy was seen by a dentist named Dr. Bryan to fill tooth #13.  Dr. Bryan also stated that teeth #2, #3, #4, and #5 needed immediate attention, but that he could not work on those teeth as the scheduled appointment was only for tooth #13. Dr. Bryan told Roy not to eat on the side of his mouth that was repaired for twenty-four hours, but Dental denied Roy a soft meal pass.

On May 1, 2007, and May 8, 2007, Roy sent IRS forms to dental requesting immediate treatment for teeth #2, #3, #4, and #5, and also advised Dental that the filling on tooth #13 was squeaking when Roy ate.  Dr. Anderson responded, denying that Dr. Bryan had told Roy that his teeth needed immediate attention, and stating that Roy was on the "call list" and would be called in "when possible."

On May 14, 2007, Roy sent an IRS to NHSP Warden Richard Gerry, advising him of his ongoing problems with Dental, as Roy's prior complaints had gone to then-Warden Cattell.  Warden Gerry responded:

> I have received an update from Dr. Anderson.  Due to staffing levels in Dental, there is a lengthy delay between appointments.  In Jan 2007 you were added to the call list for matters that cannot wait for an appointment.  You had a cleaning on 2/26/07.  On 4/30/07 treatment was done for a

13

> tooth.  You remain on the call list and services
> provided [sic] as time and staff permit.

Roy reports that inmates were not called off of work shifts
for cancellations and that "call list" appointments were shorter
than regular appointments.  On May 16, 2007, and May 23, 2007,
Roy learned that he had been called to Dental while he was at
work, and so he was not able to avail himself of the open
appointment.

On May 24, 2007, however, Roy was called off of his work
shift from the call list.  At that time, the broken filling on
tooth #5 was replaced with a composite filling.

From August 10, 2007 through August 14, 2007, Roy reports
that he suffered from pain in his ear and jaw, but that dental
sick call was cancelled all that week.  Roy instead got
antibiotics to medicate himself for the pain.  Roy continued to
have intermittent pain through September of 2007, and attempted
to go to dental sick call four times during that month, but each
time, dental sick call was cancelled.[5]

---

[5]It is worth noting at this juncture that Roy is not the
first plaintiff to file a compliant in this Court against Dr.
Anderson and the NHSP administration addressing these issues.  In
Chambers v. Gerry, et al., Civ. No. 07-CV-326-JL (D.N.H.), an
inmate plaintiff filed similar claims alleging inadequate dental
care.  On November 2, 2007, a hearing on plaintiff's motion for a
preliminary injunction was held before me in that case.  The

14

Roy alleges that the following issues remained at the time he filed this action:

Tooth #2: massive deterioration and decay from unrepaired chips since November 2005;

Tooth #3: crown missing, exposed tooth interior decaying since October 2006, tooth probably no longer alive;

Tooth #4: crown missing, dead tooth, exposed interior decaying since July 2006, abscess in root earlier "solved" by having Roy periodically pop blister on gum;

Tooth #11: damaged, chipped;

Tooth #12: missing (extracted by NHSP);

Tooth #13: possible loose filling, intermittent squeaking since installation;

Tooth #22: decay or stain visible, chip;

---

evidence at the hearing demonstrated a pattern similar to that presented here: plaintiff had to go to sick call to seek urgent dental care, where ineffective temporary or stop-gap measures were taken, while a lengthy delay ensued in scheduling appointments for permanent repairs, despite ongoing pain and risk of exacerbating the damage in the affected area.  In that case, like here, plaintiff persistently complained about the inadequacy of the dental care, until he was placed on a cancellation list, which still did not result in prompt and adequate treatment.  Dr. Anderson testified at the November 2, 2007 hearing that dental care at the NHSP was prioritized by the severity of the presenting issue.  Dr. Anderson also stated that because of a contract dispute during at least part of the time at issue in Roy's complaint, the prison dental department was seriously short-staffed, causing protracted delays in treatment that were not consistent with good dental care and fell below the ordinary standard of care.

Tooth #24: dead (root canal);

Tooth #25: dead (root canal) and supported by adjacent
        teeth, missing front;

Tooth #27: damaged, decayed or chipped;

Teeth #29-#32: intermittently loose fillings detected during
        flossing.

B.    Facts Relating to Retaliation Claim

During the pendency of this action, Roy claims that he has

been retaliated against at the prison for providing legal

assistance to other inmates, and because he filed this action in

the first place.  Roy asserts that he has been assisting other

inmates at the NHSP with their legal work for more than ten

years.  Roy claims that the staff at the prison are aware of the

assistance he has provided to other inmates, that staff members

have referred other inmates to Roy for legal help and that, on

four occasions, staff members themselves have sought Roy's help

in legal matters.  Roy reports that he has received minimal

negative feedback from NHSP staff over the last ten years

concerning his provision of legal assistance to other inmates.

The only specific negative staff reaction Roy discusses in

his complaint is that his unit manager, Lucie Bilodeau, told him

on June 20, 2006, that he was not allowed to discuss the law with

16

any other inmate, either in the context of specific cases or generally, and that providing inmates with legal assistance violated NHSP policy forbidding inmates from providing services to one another.  Roy argued to Bilodeau that because he offers his advice freely, and without any kind of compensation or quid pro quo, that his legal advice does not constitute a "service," within the meaning of NHSP policy.  Roy also asserted that he has a right to express himself, and that his provision of legal opinions and advice is simply an exercise of that right.

Roy states that on October 28, 2007, he wrote a letter to the attorney of Derek Farnsworth, an inmate, outlining litigation strategies for pursuing civil rights claims against NHSP staff members Lt. James Brown and Counselor Robert McGrath, both of whom were under the supervision of Bilodeau.  On October 30, 2007, Farnsworth sent the letter to the library to be copied.  At the library, the letter was seen by a "confidential informant" who identified the letter as Roy's handiwork.  On November 1, 2007, which was the day after the New Hampshire Attorney General's office received notice of this lawsuit, the confidential informant gave the letter to Lt. Tony Kingsbury, who shared it with Brown and Bilodeau.  When asked, Roy admitted to

17

typing the letter to the attorney in an effort to provide the
attorney with legal advice, pursuant to what he believed was his
right to do so.  Roy was written up for a disciplinary
infraction, and Kingsbury approved the infraction report on
November 7, 2007, which recommended having Roy send his word
processor out of the institution.  Roy was served with the write-
up on November 9, 2007 and filed a grievance with Warden Gerry
the same day.  On November 12, 2007, having received an
unsatisfactory response to his grievance, Roy filed a further
grievance with Commissioner Wrenn.

On November 13 and 14, 2007, Roy prepared further documents
in contemplation of continuing and adding to the instant lawsuit
and sent them to be copied at the library.  A disciplinary
hearing was held on November 15, 2007.  The hearings officer,
Beau Hickman, found Roy guilty of providing legal advice to
inmates without the permission of the Warden.  As sanctions for
the infraction, Hickman imposed extra duty, as well as five days
in punitive segregation, which was suspended, but declined to
order the removal of Roy's word processor from his possession.
Hickman also advised Roy to seek the Warden's permission prior to
giving any further legal advice to inmates.  That day, Roy wrote

an IRS to Warden Gerry seeking permission to give legal advice to
eight inmates, who he named in the IRS.

On November 16, Roy was transferred to the Special Housing
Unit ("SHU") without any further infraction, imposition of
sanction, or reclassification.  The SHU unit manager promised to
place Roy on the protective custody tier of SHU, but instead, Roy
was placed in the SHU's maximum security general population tier.
Roy was advised after his transfer that he was on "pending
administrative review" status pursuant to an undisclosed charge.
Roy later learned that he was being investigated for threatening
Anderson.  Roy denies threatening any staff member with anything
except litigation, and says the evidence of threatening amounted
to evidence that a blade was found taped to a bottle of tattoo
ink under a pool table in a recreation room.  Roy claims that he
does not have tattoos, does not play pool, never uses that
recreation room and has no institutional history of threatening
or violent behavior.  Roy was quickly cleared of the charge.  Roy
also claims that an unnamed prison official admitted to him that
his transfer to SHU was retaliatory, either for this lawsuit or
for assisting Farnsworth with a civil rights action against NHSP
staff.

19

Roy was released from the SHU on December 20, 2007.  Roy found that some of his personal property, including legal work, was missing at that time, and that he had lost his job.  Further, his word processor had been seized.  On January 6, 2008, Roy sent an IRS appealing the seizure of his word processor, but the forfeiture was affirmed.

On January 11, 2008, Roy was moved back to SHU, again on suspicion of threatening.  According to the complaint, a confidential informant reported to a prison official that he overheard Roy saying to another inmate, "You're dead."

Discussion

I.   Section 1983 Claims

Section 1983 creates a cause of action against those who, acting under color of State law, violate federal constitutional or statutory law.  See 42 U.S.C. § 1983[6]; Parratt v. Taylor, 451

---

[6]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

20

U.S. 527, 535 (1981) (<u>overruled on other grounds by</u> <u>Daniels v.</u>
<u>Williams</u>, 474 U.S. 327, 330-331 (1986)); <u>Wilson v. Town of</u>
<u>Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant
to be held liable under § 1983, his or her conduct must have
caused the alleged constitutional or statutory deprivation.  <u>See</u>
<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978); <u>Soto v.</u>
<u>Flores</u>, 103 F.3d 1056, 1061-62 (1st Cir.), <u>cert. denied</u>, 522 U.S.
819 (1997).  Because Roy's claims allege violations of federal
constitutional law by state actors, they arise under § 1983.

    A.    <u>The Eighth Amendment Inadequate Dental Care Claim</u>

Plaintiff's § 1983 complaint asserts a claim that his Eighth
Amendment rights have been violated by the NHSP's denial of
necessary medical care.  Denial of dental care is considered a
denial of medical care, which can constitute an Eighth Amendment
violation when prison authorities are deliberately indifferent to
a prisoner's serious medical needs.  <u>See</u> <u>Estelle</u>, 429 U.S. at 104
(explaining the government's obligation to provide medical care
to inmates to comply with the proscription against "unnecessary
and wanton infliction of pain"); <u>see</u> <u>also</u> <u>Hunt v. Dental Dep't</u>,
865 F.2d 198, 200 (9th Cir. 1989) ("'Dental care is one of the
most important medical needs of inmates.'" (quoting <u>Ramos v.</u>

21

Lamm, 639 F.2d 559, 576 (10th Cir. 1980))). "Accordingly, the
eighth amendment requires that prisoners be provided with a
system of ready access to adequate dental care." Hunt, 865 F.2d
at 200; see also Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.
1998) (cognizable claim regarding inadequate dental care can be
based on various factors including pain suffered by plaintiff);
Dean v. Coughlin, 623 F. Supp. 392, 399 (S.D.N.Y. 1985) (failure
to provide routine dental care violates Eighth Amendment rights);
Laaman v. Helgemoe, 437 F. Supp. 269, 313 (D.N.H. 1977) ("Inmates
are entitled to reasonable dental care.").

Deliberate indifference is manifested by prison officials
who "intentionally deny[] or delay[] access to medical care or
intentionally interfer[e] with the treatment once prescribed."
Estelle, 429 U.S. at 104-05. "A medical need is 'serious' if it
is one that has been diagnosed by a physician as mandating
treatment, or one that is so obvious that even a lay person would
easily recognize the necessity for a doctor's attention."
Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir.
1990). Although a mere delay in needed dental care will not
violate the Eighth Amendment, when that delay causes or gives
rise to a substantial risk of serious harm to a prisoner, the

requisite deliberate indifference to a serious medical need is found.  See Farrow v. West, 320 F.3d 1235, 1243-44 (11th Cir. 2003) (need for dental care combined with the effects of not receiving it may give rise to an Eighth Amendment claim); see also Boyd v. Knox, 47 F.3d 966, 969 (8th Cir. 1995) (delay in dental care coupled with knowledge of patient's pain can support Eighth Amendment claim).

Plaintiff alleges that he sought out dental care consistently, utilizing proper administrative channels, and received substandard, ineffective treatment, no treatment at all, or treatment so delayed that his condition worsened considerably. The worsening of his condition between the setting of the appointment and the appointment itself resulted in further delays in treatment, because, at the time of his appointment, his dental needs would exceed what could be treated int eh appointment time that head been allotted for the lesser problem.  Roy also alleges that he made each of the defendants aware of his pressing need for reparative dental treatment, and yet they did nothing to assure the timely provision of such treatment.

I find that these allegations are sufficient to a claim for deliberate indifference to Roy's dental needs by the defendants.

23

In an Order issued simultaneously with this Report and
Recommendation, I will direct service of this Eighth Amendment
claim on defendants Wrenn, Gerry, Cattell, Anderson, and McLeod.[7]

    B.   <u>Retaliation Claims</u>

    Conduct on the part of prison officials that is "not
otherwise constitutionally deficient is actionable under § 1983
if done in retaliation for the exercise of constitutionally
protected first amendment freedoms." <u>Oropallo v. Parrish</u>, No.
93-1953, at *3, 1994 WL 168519 (D.N.H. May 5, 1994), <u>aff'd</u>, 23
F.3d 394 (1st Cir. 1994) (citing <u>Ferranti v. Moran</u>, 618 F.2d 888,
892 n.4 (1st Cir. 1980)); <u>see</u> <u>Goff v. Burton</u>, 7 F.3d 734, 738
(8th Cir. 1993) (prison officials cannot lawfully impose a
disciplinary sanction against a prisoner in retaliation for the
prisoner's exercise of his constitutional right). "[G]overnment
actions, which standing alone do not violate the Constitution,
may nonetheless be constitutional torts if motivated in

---

    [7]Roy also attempts to state claim regarding the inadequacies
in his medical care by alleging that such a deficincy violates
the Laaman Consent Decree, <u>Laaman v. Helgemoe</u>, 437 F. Supp. 269,
326-31 (D.N.H. 1977).  The decree, however, has been vacated.
Furthermore, an inmate may not bring an individual Section 1983
action for injunctive or declaratory relief  based on consent
decree violations.  <u>See</u> <u>Martel v. Fridovich</u>, 14 F.3d 1, 3 n.4
(1st Cir. 1993).  Accordingly, I recommend that Roy's claim of a
violation of the Laaman Consent Decree be dismissed, as it fails
to state any claim upon which relief might be granted.

substantial part by a desire to punish an individual for exercise of a constitutional right." <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003).

Of course, prison officials may make policy that is reasonably related to legitimate penological interests, even at the expense of certain constitutional rights. <u>See</u> <u>Beard v. Banks</u>, ___ U.S. ___, 126 S.Ct. 2572, 2579 (2006) (citing <u>Turner v. Safley</u>, 482 U.S. 78, 89-90 (1987)). However, "actions otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms." <u>Ferranti</u>, 618 F.2d at 892 n.4 (citing <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979)).

In order to state a claim for retaliation for an exercise of his First Amendment rights, an inmate must allege: (1) the conduct which led to the alleged retaliation was protected by the First Amendment, (2) some adverse action at the hands of the prison officials, and (3) a causal link between the exercise of the inmate's First Amendment rights and the adverse action. <u>Price v. Wall</u>, 428 F. Supp. 2d 52, 55 (D.R.I. 2006); <u>see also</u> <u>LaFauci v. N.H. Dep't of Corr.</u>, No. Civ. 99-597-PB, 2005 WL 419691, at *7 (D.N.H. Feb. 23, 2005) (Unpublished Order). Roy

25

claims that the defendants have retaliated against him by
subjecting him to certain adverse conditions of confinement
because he a) filed this lawsuit against the NHSP defendants and
b) assisted another inmate in litigating a lawsuit against NHSP
employees.  Roy alleges the following specific acts were taken
with retaliatory motive by defendants: (1) he was moved to the
SHU twice, "pending administrative review" on suspicion that he
had threatened another individual, and that as a result he (2)
lost his prison job and pay status, (3) lost property, including
legal work and materials, and (4) had his word processor seized
and removed from his possession.  I consider each of these
elements of a retaliation claim in turn.

      1.   <u>Conduct Protected by the First Amendment</u>

Incarceration brings about necessary limits on certain
aspects of an inmate's constitutional rights.  <u>Turner</u>, 482 U.S.
at 84.  The First Amendment rights of prisoners may be abridged
to the extent that the exercise of those rights is "inconsistent
with his status as a prisoner or with the legitimate penological
objectives of the corrections system."  <u>Jones v. N.C. Prisoners'
Labor Union, Inc.</u>, 433 U.S. 119, 129 (1977) (internal citations
omitted).

a.   <u>Free Speech</u>

The First Amendment protects an individual's right to speak freely.  <u>See</u> U.S. Const. amend. I.[8]  Prison inmates, however, do not possess a special First Amendment right to provide legal advice or assistance, orally or in writing, to other inmates, that exceeds their right to speak or write freely on nonlegal topics.  <u>Shaw v. Murphy</u>, 532 U.S. 223, 228 (2001).  Accordingly, as no special privilege attaches to expression or speech that takes the form of inmate-to-inmate legal assistance, such expression may be constitutionally limited by prison policy that serves a valid penological objective.  Here, according to the pleadings filed by Roy, inmates may not provide legal assistance to one another at the NHSP because it violates the prison's proscription against inmates providing services for one another, even if it is not done on a fee-for-service basis.  Here, Roy's own pleadings demonstrate that the restriction on his right to provide legal advice was reasonably related to the penological objective of not allowing inmates to provide services to one another, as that practice could create obligation or coercion in

---

[8]U.S. Const. amend. I states that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

a prison context.  Therefore, I find that Roy has not alleged a

sustainable retaliation claim, or other First Amendment claim,

based on his right to provide legal assistance or advice to other

inmates.  Accordingly, I recommend that any such claim be

dismissed.[9]

> b.   Petitioning the Government for a Redress of
>      Grievances

The right to petition the government for a redress of

grievances has been characterized as "among the most precious of

the liberties safeguarded by the Bill of Rights."  United Mine

Workers v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967).  In

---

[9]To the extent that Roy relies on the attorney-client
privilege to protect his right to correspond with Farnsworth's
attorney, his reliance is misplaced.  "The [attorney-client]
privilege springs from the attorney-client relationship."  FDIC
v. Ogden Corp., 202 F.3d 454, 461 (1st Cir. 2000).  In New
Hampshire, such a relationship comes into being "'when (1) a
person seeks advice or assistance from an attorney, (2) the
advice or assistance sought pertains to matters within the
attorney's professional competence, and (3) the attorney
expressly or impliedly agrees to give or actually gives the
desired advice or assistance.'"  State v. Gordon, 141 N.H. 703,
705, 692 A.2d 505, 507 (1997) (quoting McCabe v. Arcidy, 138 N.H.
20, 25, 635 A.3d 446, 449 (1993)).  Roy claims that he gave
inmate Farnsworth a letter to send to Farnsworth's attorney
offering advice on legal strategy.  None of the three factors
listed above are met by this transaction, and therefore no
attorney-client relationship was established between Roy and
Farnsworth's attorney.  Accordingly, no attorney-client privilege
existed in Roy's letter to Farnsworth's attorney.  I recommend
the dismissal of any claim intended to rely on the assertion of
the attorney-client privilege.

the prison context, this means that inmates must be "permit[ted] free and uninhibited access . . . to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers." <u>Sostre v. McGinnis</u>, 442 F.2d 178, 200 (2d Cir. 1971) (en banc).

Roy exercised his First Amendment right to petition the government for a redress of grievances by filing this lawsuit. Accordingly, I find that Roy has alleged a First Amendment right sufficient to meet the first requirement for stating a retaliation claim.

      2.  <u>Adverse Action</u>

To state an adverse action, plaintiff must allege that the defendants subjected him to "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." <u>Dawes v. Walker</u>, 239 F.3d 489, 492 (2d Cir. 2001), <u>overruled in part on other grounds by</u> <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 187 n.6 (2d Cir. 2002); <u>see</u> <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 398 (6th Cir. 1999).  Even if an inmate is not chilled in his expression, he may still state a claim for retaliation if it is arguable that the retaliatory behavior alleged is sufficient and of the type to deter an ordinary person

29

from exercising his rights.  Gay, 2005 WL 756731, *8 (citing

Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  Roy

alleges that he was twice transferred to SHU under suspicion of

threatening first Dr. Anderson, and then an inmate.  While in

SHU, Roy alleges that he was stripped of his prison job, his

prison pay status, and his property.  There is no doubt that, to

an inmate of ordinary firmness, these constitute adverse actions

with important implications for the quality of an inmate's

institutional life.  Further, it is reasonable to conclude that

ordinary inmates, faced with potential penalties for filing a

lawsuit might well choose not to file a lawsuit in order to

minimize negative consequences to himself.  Roy, therefore, has

stated sufficient facts to allege that adverse actions were taken

against him that would chill an ordinary inmate in Roy's

situation from exercising his First Amendment rights to satisfy

the second prong of a retaliation claim.

> 3.   Retaliatory Action Caused by First Amendment
>      Violation

Circumstantial evidence is often enough to support a claim

that an adverse action was taken with retaliatory intent, as

intentions are often difficult to prove through direct evidence.

Beauchamp v. Murphy, 37 F.3d 700, 711 (1st Cir. 1994); Ferranti,

30

618 F.2d at 892 (chronology of events provided support for
inference of retaliation), McDonald, 610 F.2d at 18 (same); see
also Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  Here,
Roy alleges that within a day of the Attorney General's office
being advised of his civil rights lawsuit regarding dental
claims, he was transferred to SHU on suspicion that he had
threatened the NHSP dentist.  This sequence of events,
demonstrating that adverse actions against Roy followed closely
on the heels of the filing of this lawsuit, presents sufficient
evidence of an adverse act specifically taken in response to
Roy's exercise of his First Amendment rights to meet the third
requirement for a retaliation claim.  Accordingly, I find that
Roy has stated sufficient facts to allege an action for
retaliation upon which relief may be granted, and I direct that
this claim be served on each of the defendants named in the
complaint.

II.  Liability of Defendants

     In this § 1983 action, plaintiff seeks both injunctive and
monetary relief, and has named the following individuals as
defendants: Dr. Anderson, Dr. McCleod, Warden Gerry, Warden
Cattell, Commissioner Wrenn, unit manager Bilodeau, and Lt.

Kingsbury.

Liberally construing the complaint in plaintiff's favor, as
I am required to do at this preliminary stage of review, because
he seeks both injunctive and monetary relief, I find he intends
to bring this action against each of the defendants in both their
official and individual capacities.[10]   Since each defendant works
for the DOC, a suit against them in their official capacities is
a suit against the DOC, which cannot be held liable for money
damages under § 1983 because of the immunity afforded state
agencies under the Eleventh Amendment.   See P.R. Aqueduct & Sewer
Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993) (absent
waiver, neither a state nor its agencies may be subject to suit
in federal court); Will v. Mich. Dep't of State Police, 491 U.S.
58, 71 (1989) (holding that neither a state nor its officials
acting in their official capacities are "persons" under § 1983).
Yet, to obtain the prospective injunctive relief plaintiff seeks

---

[10]Roy has sued each defendant in both their individual and
official capacities, except defendant Warden Gerry, who has been
sued only in his official capacity.  However, I find that Roy
alleged sufficient facts to demonstrate that Warden Gerry may
also bear responsibility for the constitutional deprivations
alleged in his individual capacity, and I will construe the
complaint, therefore, as naming each of the defendants in their
individual as well as official capacities.

here, he must bring this action against defendants in their official capacities.  See id. at 71 n.10; see also Brandon v. Holt, 469 U.S. 464, 471-72 (1985) (suing an officer in his or her official capacity is another way of suing the public entity that the official represents); Ex parte Young, 209 U.S. 123, 159-60 (1908).  On the other hand, in order to obtain the monetary relief plaintiff seeks, he must pursue his claims against defendants in their individual capacities.

Defendants Wrenn, Cattell, McLeod, Anderson and Gerry serve a supervisory function within the DOC.  Although there is no supervisory liability in § 1983 actions based on a respondeat superior theory of liability, see Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997); City of Canton v. Harris, 489 U.S. 378, 385 (1989), a defendant supervisor can be held liable based on the defendant's actual notice of facts sufficient to render the official responsible for reasonable inquiry into the complaint. See Feliciano v. DuBois, 846 F. Supp. 1033, 1045 (D. Mass. 1994) (citing Layne v. Vinzant, 657 F.2d 468 (1st Cir. 1981)).  A supervisor also may be held liable for his own acts, or omissions, if they rise to the level of reckless or callous indifference to the constitutional rights of others.  See Febus-

33

Rodriquez v. Betancourt-Lebron, 14 F.3d 87, 91-92 (1st Cir.
1994).  Finally, a supervisor may be held liable under § 1983 if
he or she "formulates a policy or engages in a practice that
leads to a civil rights violation committed by another."  Camilo-
Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).

Defendants Anderson, McLeod, Gerry, Cattell, and Wrenn are
each alleged to have been aware of plaintiff's need for dental
care, and nevertheless failed to take any steps to ensure the
requisite care would be provided within an appropriate or
reasonable time period.  These allegations state the minimal
facts necessary to allow plaintiff's Eighth Amendment claim to
proceed against these defendants in their supervisory capacities.
In an order issued simultaneously herewith, I will order the
clerk's office to serve the complaint on these defendants.

### Conclusion

For the foregoing reasons, I recommend dismissal of: (1)
Roy's claims alleging retaliation or a First Amendment violation
based on the asserted right to provide legal assistance to other
inmates, (2) claims attempted to be brought on behalf of other
inmates, (3) the claim based on a violation of the Laaman Consent
Decree, and (4) the claim based on an alleged violation of the

34

attorney-client privilege.  In an Order issued simultaneously with this Report and Recommendation, I direct that the remaining claims in the complaint be served on the named defendants.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date:      February 29 , 2008

cc:        Steven J. Roy, pro se

35

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Steven J. Roy

v.                                          Civil No. 07-cv-353-PB

William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.[1]


**O R D E R**


Before the Court is New Hampshire State Prison("NHSP")
inmate Steven Roy's complaint and addenda thereto (document nos.
1, 13, 16 & 17),[2] filed pursuant to 42 U.S.C. § 1983.  The matter
is before me for preliminary review to determine whether the
complaint states any claim upon which relief might be granted.
See United States District Court District of New Hampshire Local
Rule ("LR") 4.3(d)(2)(A) (authorizing magistrate judge to
preliminary review pro se prisoner complaints).

---

[1]In addition to William Wrenn, Roy also names New Hampshire
State Prison ("NHSP") Warden Richard Gerry, former NHSP Warden
Bruce Cattell, NHSP Medical Director Dr. Robert McLeod, NHSP
Dental Director Dr. Karen Anderson, NHSP Unit Manager Lucie
Bilodeau, and NHSP Lt. Tony Kingsbury as defendants to this
action.

[2]The complaint and addenda, in the aggregate, will be
considered to be the complaint in this matter for all purposes.

For reasons fully explained in the Report and Recommendation
issued simultaneously with this Order, I direct that the Eighth
Amendment claim alleging a denial of adequate dental care be
served on defendants Anderson, McLeod, Gerry, Cattell, and Wrenn.
I further direct that the claim alleging retaliation for Roy's
exercise of his First Amendment right to petition the government
for a redress of grievances be filed on all of the defendants
named in this action.

I order the complaint (document nos. 1, 13, 16 & 17) be
served on Defendants.  The Clerk's office is directed to serve
the New Hampshire Office of the Attorney General (AG), as
provided in the Agreement On Acceptance Of Service, copies of
this order, the Report and Recommendation, and the complaint
(document nos. 1, 13, 16 & 17).  See LR 4.3(d)(2)(C).  Within
thirty days from receipt of these materials, the AG will submit
to the court an Acceptance of Service notice specifying those
defendants who have authorized the AG's office to receive service
on their behalf.  When the Acceptance of Service is filed,
service will be deemed made on the last day of the thirty-day
period.

2

As to those defendants who do not authorize the AG's office to receive service on their behalf or whom the AG declines to represent, the AG shall, within thirty days from receipt of the aforementioned materials, provide a separate list of the last known addresses of such defendants.  The Clerk's office is instructed to complete service on these individuals by sending to them, by certified mail, return receipt requested, copies of these same documents.

Defendants are instructed to answer or otherwise plead within twenty days of acceptance of service.  See Fed. R. Civ. P. 12(a)(1)(A).

Plaintiff is instructed that all future pleadings, written motions, notices, or similar papers shall be served directly on the Defendants by delivering or mailing the materials to them or their attorneys, pursuant to Fed. R. Civ. P. 5(b).

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge

Date:  February **29** , 2008

cc:    Steven J. Roy, pro se

3