**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Steven J. Roy</u>


     v.                              07-cv-353-PB

<u>William Wrenn, Commissioner,</u>
<u>New Hampshire Department of</u>
<u>Corrections, et al.</u>



**<u>REPORT AND RECOMMENDATION</u>**

     In this civil rights action, pro se plaintiff Steven Roy, an

inmate at the New Hampshire State Prison ("NHSP"), moved for a

preliminary injunction (document nos. 7 and 14), claiming he had

been reassigned to more secure housing in retaliation for having

exercised his First Amendment rights to access the courts and to

free speech.  An evidentiary hearing was held on April 3, 2008.

As explained more fully below, I find the evidence adduced at the

hearing satisfies the prerequisites for obtaining preliminary

injunctive relief on the retaliation claim and, therefore,

recommend that his motion be granted.  Accordingly, I recommend

that plaintiff be reinstated to the NHSP's Medium Custody South

("MCS")  housing unit and that his disciplinary record be

expunged to reflect the findings set forth below.

<u>Discussion</u>

**1.  Background[1]**

The salient background facts are as follows.

In the fall of 2007, plaintiff was housed in MCS, where he enjoyed such privileges as working and hobby craft.  On October 23, 2007, he commenced this civil rights action to complain about the dental care he was receiving.  On October 29, 2007, plaintiff helped another inmate write a letter to that inmate's attorney, complaining about "serious staff misconduct by two prison employees."  Document no. 7 at 2; <u>see</u> <u>also</u> Defs.' Exhibits to Preliminary Injunction Hearing, Ex. C ("Defs. Ex.").  That inmate brought the letter to the library to be copied on October 30, 2007, but did not pick it up that day.  <u>See</u> Defs. Ex. A.

On November 1, 2007, a third inmate, who was a "confidential informant" ("CI"), somehow obtained a copy of the letter[2] and

---

[1]For a thorough summary of all the background facts alleged in support of plaintiff's civil rights claims, see my Report and Recommendation dated February 29, 2008 (document no. 18) ("R&R").

[2]There was some confusion about how the CI obtained a copy of the October 29, 2007, letter and gave it to defendants.  The evidence showed that inmate Randy Duquette ("Duquette"), who was a law clerk on duty on Wednesday, October 30, had a history of trouble with plaintiff.  The evidence suggested, but did not conclusively establish, that Duquette may have taken the copy of the October 29 letter that was given, via the CI, to defendants.

gave it to two NHSP staff members who are defendants here,
Lieutenant Anthony Kingsbury ("Kingsbury") and Unit Manager Lucie
Bilodeau ("Bilodeau"), who read it, and shared its contents with
the two staff members discussed in the letter.  <u>See</u> Document no.
7.  Bilodeau had plaintiff's word processor removed from his cell
and questioned him about the letter.  Plaintiff admitted to
having helped write the letter and having provided similar
assistance to other inmates previously.  As a result, Bilodeau
wrote a disciplinary report ("DR") about plaintiff's improper
provision of legal services,[3] but returned his wordprocessor
while the matter was investigated.  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> Defs. Ex. A
& B.

On November 15, 2007, a disciplinary hearing was held
regarding the incident.  Plaintiff admitted that he had provided

---

Duquette was temporarily removed from his job at the library
while the incident of the improper removal of the copied letter
was investigated.  <u>See</u> Defs. Exs. A & Q.

[3]That DR prompted plaintiff to amend his civil rights action
before this court and to draft his preliminary injunction motion.
The amendment and motion, however, were not filed until a month
later, on December 12 and 18, respectively, which plaintiff
contends further evidences the retaliation he allegedly suffered,
claiming defendants deliberately stalled copying his papers and
misplaced them.  He has continued to supplement his preliminary
injunction motion up to and throughout the preliminary injunction
hearing.  <u>See</u> <u>e.g.</u> Document nos. 14, 16, 17, 22-25 and 28.

the help without first obtaining permission from the warden.  <u>See</u>
Defs. Ex. B.  He was found guilty of providing legal services to
another inmate, in violation of NHSP rules, and was sentenced to
five days of "hole" time, which was suspended for 90 days, loss
of canteen privileges, and "some 'extra duty.'"  Document no. 7
at 3; <u>see</u> <u>also</u> Defs. Ex. B.[4]

On November 16, 2007, plaintiff, who was classified as a "C
3" or medium security inmate, was taken to the Secure Housing
Unit ("SHU"), a "C5/C6" or maximum security housing unit, despite
not having been charged with any new infraction and not having
been reclassified.  Unbeknownst to plaintiff, on that day a CI
reported that plaintiff had threatened to hurt NHSP dentist Karen
Anderson, another defendant in this action, for the poor work she
had done on his teeth.  <u>See</u> Defs. Ex. E; <u>see</u> <u>also</u> Document nos.
14 & 16.  Staff at the NHSP had heard plaintiff possessed a
shank, and they found a blade and bottle of tattoo ink taped to
the underside of a pool table in one of the prison's recreational
rooms.  Because of this report, plaintiff's word processor was
taken on November 19, 2007, "due to [plaintiff's] latest

_____

[4]That same day plaintiff requested permission from the
warden to provide legal services to other inmates, which was
denied on November 20, 2007.  <u>See</u> Defs. Ex. E.

disciplinary report and past behavior."  Defs. Ex. D.

Plaintiff denied any knowledge of or responsibility for the tattoo items hidden in the recreation room.  After administrative investigation, he was cleared of the charges and released from SHU on December 20, 2007.  See Document no. 16 and Defs.' Ex. H & J.[5]  Upon his release, plaintiff learned that his word processor had been seized, that his legal work had been "rifled through," that some of his legal papers were missing, and that he had lost his job.  Plaintiff complained about these sanctions through the prison's grievance system, and succeeded in preventing his word processor from being removed from the prison and in getting back into the prison employment system.  See Defs. Exs. H–L; see also Document nos. 16 & 17.

The last incident about which plaintiff complains in support of his request for preliminary injunctive relief involves his alleged threatening of another inmate at the NHSP law library. Sometime between plaintiff's December 20, 2007, release from SHU and his January 11, 2008, return to SHU, plaintiff allegedly was overheard threatening Duquette by saying, "You're dead."

_____

[5]Testimony at the preliminary injunction hearing indicated the investigation is not yet complete, because, at the time of the hearing, finger prints from the shank were still being analyzed at the state forensic laboratory.  See Defs. Ex. H at 2.

Duquette told defendant Kingsbury about the threat on January 11, 2008.  A CI report, which was dated January 8, 2008, but given to defendants on January 10, 2008, corroborated that the threat was made, but said it happened during the week before Christmas.[6]  A DR, dated January 11, 2008, stated that the incident occurred on January 11, 2008, which prompted plaintiff's transfer to SHU pending administrative review.  See Document no. 17 at 11; see also Defs. Ex. M.  Plaintiff denied having made the threat.  An investigation followed.

Plaintiff filed a request for witnesses to appear in his support at the disciplinary hearing, see Document no. 24 & Pl.'s Ex. 1, but the hearing officer never received the request.  See Defs. Ex. M.  As a result, plaintiff was denied any witnesses at the January 22, 2008, hearing and was found guilty based on the DR, the CI report and the prison investigation.  See id.  After the hearing, plaintiff was returned to "C 3" status but was not returned to MCS.  Instead, because of his two DRs, plaintiff was placed in less desirable housing in the "Hancock" building.  See Defs. Ex. O; see also Document nos. 22 & 23.

---

[6]These facts came from a sealed exhibit, submitted after the hearing, which indicated the CI's affidavit was originally dated January 8, 2008, but was rewritten on January 9 and reported to defendants on January 10, 2008.

At the preliminary injunction hearing, there was conflicting evidence about when the death threat to Duquette occurred. Defendants first represented that plaintiff had made the threat on January 11, 2008, as reflected in the DR.  See Defs. Ex. M ("infraction date 11-Jan-08").  There was evidence that suggested Duquette may have been working as an assistant librarian on that day, but it was confusing.  Evidence suggesting Duquette was in the library included plaintiff's request slip, which listed as one of his potential witnesses at the January 22 disciplinary hearing "the inmate using the computer closest to Duquette's desk."  Pl.'s Ex. 1.  At the preliminary injunction hearing, testimony bolstered the conclusion that Duquette had been working that day.  The NHSP law librarian, Becky Harding, testified that Duquette's desk is next to hers in the library, and that she had not heard plaintiff threaten Duquette on January 11, 2008. Plaintiff also called several inmates who testified they did not observe any exchange between plaintiff and Duquette on January 11, 2008, in the law library.  On the other hand, the "law attendees" sign-in sheet for "1/11/08 am" indicated that plaintiff was there between 10 and 11 but that Duquette had not signed in to use the library any time that morning, suggesting he

7

was not there at all.  The question of whether he would have
needed to sign in if he had been working as an assistant
librarian that day, however, remains open.  See Pl.'s Ex. 6.

Defendants then proffered December 17, 2007, as the date
when plaintiff and Duquette were in the law library together;
however, when Harding reviewed the sign-in sheet for that day she
clarified that plaintiff had been confused with another inmate,
also named Roy.  During her testimony, Harding authenticated
various sign-in sheets, none of which put plaintiff in the
library with Duquette at any time between his December 20, 2007,
release from SHU and his January 11, 2008, return to SHU.
Defendant Kingsbury testified that plaintiff had made the threat
on December 20, when he was released from SHU, but that it was
not reported until January 11, 2008.  Finally, following the
hearing, defendants submitted a sealed exhibit in which a CI
reported the threat had occurred "the week before Christmas."

At the time of the preliminary injunction hearing, plaintiff
had not been given his job at the NHSP furniture shop back, but
has since been reinstated there.  See Defs. Notice of Plntf's
Housing and Job Status (document no. 45).  Based on the current
record, plaintiff is still housed in the Hancock building and

8

still has not had his hobby craft privileges reinstated, because

he had to wait six months following the first DR, from November

1, 2007, to request that privilege again.  See id.

## 2.  Standard of Review

Plaintiff seeks injunctive relief to prevent a continuation

of the alleged retaliatory treatment he has endured.  As the

moving party, plaintiff bears the burden of demonstrating that an

injunction is needed to prevent irreparable harm and to preserve

the status quo, to enable a meaningful disposition of his claims.

See CMM Cable Rep. v. Ocean Coast Props., 48 F.3d 618, 620–21

(1st Cir. 1995) (enjoining certain conduct permits the court

"more effectively to remedy discerned wrongs").  Such a situation

arises when some harm from the challenged conduct cannot be

adequately redressed with traditional legal or equitable remedies

following a trial.  See Ross–Simons of Warwick, Inc. v. Baccarat,

Inc., 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm

where legal remedies are inadequate); Acierno v. New Castle

County, 40 F.3d 645, 653 (3d Cir. 1994) (explaining irreparable

harm and its effect on the contours of preliminary injunctive

relief).  To carry this burden, plaintiff must demonstrate:  "(1)

the likelihood of success on the merits; (2) the potential for

irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006); see also Ross-Simons of Warwick, Inc., 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction).

If plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," id., insufficient to carry the weight of this extraordinary relief on their own. See Esso Standard Oil Co., 445 F.3d at 18 (the "sine qua non . . . is likelihood of success on the merits") (internal quotation omitted)).  While likelihood of success is the critical factor, a preliminary injunction will not issue unless plaintiff also demonstrates he will suffer irreparable harm without the requested injunctive relief.  See Ross-Simons of Warwick, Inc., 102 F.3d at 19 ("the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem").  Because likelihood of success on the merits is the touchstone of the preliminary injunction inquiry, I

10

begin by analyzing plaintiff's retaliation claim.

### 3.  Likelihood of Success on the Retaliation Claim

Plaintiff asserts that defendants retaliated against him for filing this civil rights action in October 2007 and for helping write the October 29, 2007, letter to another inmate's attorney. He bases his retaliation claim on the fact that for several years he has provided the assistance for which he was suddenly punished in the fall of 2007.  He claims his placement in SHU, in November 2007 and January 2008, and the attendant loss of privileges evidence retaliation.  Plaintiff contends that this adverse treatment was a consequence of his exercising his First Amendment rights, and that his assistance to other inmates with their legal work has put them at risk of retaliatory treatment as well.[7]

It is well-settled that "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (citing

---

[7]Plaintiff cannot bring claims on behalf of other inmates. See Amann v. Stow School Sys., 982 F.2d 644, 648 n.2 (1st Cir. 1992) ("We generally do not allow non-lawyers to represent litigants other than themselves.").

authority); see also Ferranti v. Moran, 618 F.2d 888, 891-92 (1st
Cir. 1980) (finding § 1983 retaliation claim alleged based on
interference with inmates efforts to access the courts); Oropallo
v. Parrish, No. 93-1953, 23 F.3d 394, 1994 WL 168519, at *4 (1st
Cir. May 5, 1994) (explaining how conduct done in retaliation for
exercising First Amendment rights is actionable under § 1983).
To demonstrate retaliation, there must be "(1) constitutionally
protected conduct, (2) an adverse action by prison officials
sufficient to deter a person of ordinary firmness from exercising
his [constitutional] rights, and (3) a causal link between the
exercise of his constitutional rights and the adverse action
taken against him."  Mitchell, 318 F.3d at 530 (internal
quotation omitted)).  The chronology of events is critical,
because "a retaliatory state of mind typically is not susceptible
to proof by direct evidence that can be averred in a complaint."
Ferranti, 618 F.2d at 892 (citing McDonald v. Hall, 610 F.2d 16,
18 (1st Cir. 1979)).  Retaliatory intent can be inferred from the
chronology of the cited events.  See id.; see also Oropallo, 1994
WL 168519 at *4  (explaining how the challenged event must follow
the exercise of the constitutional right).  Each element of
plaintiff's retaliation claim is addressed below in turn.

(a)   Constitutionally Protected Conduct

Plaintiff contends he was exercising his First Amendment rights when he filed this civil rights action in October 2007. Plaintiff's right to file this civil rights action is clearly protected by the Constitution.  See Bounds v. Smith, 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."). While the constitutional source of that right is not definitively clear, see Lewis v. Casey, 518 U.S. 343, 366–67 (1996) (Thomas, J. concurring), it is generally settled that it arises out of the Fourteenth Amendment's due process and equal protection clauses, and the First Amendment's guarantee of the right to petition the government for a redress of grievances.  See Woodford v. Ngo, 548 U.S. 81, 122 (2006) (Stevens, J. dissenting) (arises from the right to petition the government for a redress of grievances); Fabiano v. Hopkins, 352 F.3d 447, 453 (1st Cir. 2003) (same); but see Bounds, 430 U.S. at 818 (due process clause).  Accordingly, when plaintiff filed his civil rights action in October 2007, he was engaging in constitutionally protected conduct for purposes of satisfying the first element of his retaliation claim.

Plaintiff also contends his help writing the October 29,

13

2007, letter was protected by the First Amendment's guarantee of free speech.  As explained in my R&R, plaintiff's help in writing the letter is not entitled to any greater protection under the First Amendment simply because it involved legal assistance.  <u>See Shaw v. Murphy</u>, 532 U.S. 223, 228 (2001) (concluding that inmate-to-inmate correspondence involving legal advice is subject to the same analysis of any other prisoner communication).  Instead, the NHSP's regulation that restricts inmate-to-inmate communication containing legal assistance is subject to the standard analysis of whether or not the restriction on plaintiff's First Amendment rights is reasonably related to legitimate penological goals and, therefore, constitutional.  <u>See</u> <u>id.</u> at 229-30 (citing <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).[8]  As written, the policy at

---

[8]While <u>Shaw</u> held that letters giving legal advice could be restricted under the same standard balancing test as any other inmate communication, <u>see</u> <u>id.</u> at 228, it also clearly upheld the right of inmates to receive legal assistance.  In <u>Shaw</u>, the challenged regulation prevented high-security inmates, which the plaintiff was, from meeting with maximum-security inmates. Plaintiff had written a letter giving legal advice to a maximum-security inmate.  The letter was intercepted and the plaintiff was punished.  The plaintiff argued he had a First Amendment right to provide legal advice that was greater than the First Amendment protection given to other inmate communication.  The Court rejected that argument, and found instead that the regulation's constitutionality did not depend on the subject of the communication but rather on whether it reasonably advanced legitimate penological goals.  <u>See</u> <u>Shaw</u>, 532 U.S. at 229-30 (citing <u>Turner</u>'s balancing test).  While the Court held that

issue here required plaintiff to obtain the warden's permission before advising another inmate on legal matters.  <u>See</u> PPD 7.12. As explained in my R&R when I recommended dismissal of the claim that his First Amendment rights had been violated because of that policy, the regulation is a reasonable restriction on plaintiff's free speech rights.  Plaintiff did not have a constitutionally protected right to help with the October 29, 2007, letter without pre-approval by the warden.

Moreover, to the extent the challenged regulations impinged on the right to obtain legal assistance from another inmate, that claim cannot be asserted by plaintiff.  The fundamental right to access the courts, which subsumes the right to receive legal assistance when needed to ensure that access is "adequate, effective, and meaningful," <u>Bounds</u>, 430 U.S. at 821-22, attaches to the person receiving, not giving, the help.  <u>See</u> <u>Lewis</u>, 518 U.S. at 349-52 (standing to assert constitutional violation requires the inmate to have suffered an "actual injury" by the

---

speech involving legal advice could be restricted like any other speech, <u>see</u> <u>id.</u>, it specifically upheld the inmate's right to receive legal assistance.  <u>See</u> <u>id.</u> at 225 (the maximum security inmate was offered another inmate law clerk for assistance). <u>Shaw</u> makes clear that the right to legal assistance can be restricted to advance legitimate penological interests, but it cannot be eliminated.  <u>See</u> <u>id.</u> at 230-31 and fn. 3.

lack of legal assistance in the litigation of his claim).
Plaintiff, as the person who was providing the help with the
October 29, 2007, letter, was not an inmate who needed legal
assistance in order to adequately and effectively exercise his
fundamental right to access the courts.  See id.; see also Shaw,
532 U.S. at 231 n.3 ("Under our right-of-access precedents,
inmates have a right to receive legal advice from other inmates
only when it is a necessary 'means for ensuring a "reasonably
adequate opportunity to present claimed violations of fundamental
constitutional rights to the courts."'" (internal quotations
omitted)).  Because plaintiff's unauthorized assistance with
drafting the October 29, 2007, letter, was not protected by a
right either to free speech or to access the courts, his
retaliation claim cannot be based on that conduct.

    (b)  The Adverse Treatment and Causal Link

    Plaintiff next must establish that the adverse treatment he
has identified occurred because he filed this civil rights
action.  Plaintiff clearly endured adverse treatment when he was:
(1) disciplined based on the November 1, 2007, DR and the
November 15, 2007, disciplinary hearing findings; (2) transferred
to SHU on November 16, 2007, pending administrative review of the

16

Dr. Anderson threat and the illicit tattoo ink and shank; and (3) placed back in SHU on January 11, 2008, based on the CI report that he had threatened Duquette in the law library.  The critical issue is whether this adverse treatment was the result of an intent either to punish plaintiff for bringing this action or to deter him from pursuing his claims, or whether the discipline he suffered was justified for a reason other than retaliation.  See Nethersole v. Bulger, 287 F.3d 15, 19 (1st Cir. 2002) (explaining that defendant can defeat the claim, even if retaliation was a motivating factor in plaintiff's treatment, if defendant can prove that adverse employment action would have resulted regardless of the protected conduct).  Defendants proffer three separate justifications for why plaintiff was disciplined.  Each justification is addressed below in turn.

### (I)  The Improper Provision of Legal Services

Defendants argue plaintiff was disciplined in November 2007 because the October 29, 2007, letter violated the NH Department of Corrections Policy and Procedure Directive ("PPD") "on access to the courts for all inmates," which prohibits "inmates from assisting other inmates with their legal work, unless pre-approved by the facility warden."  PPD 7.12.  Yet plaintiff was

17

charged with violating NHSP Rule 16B, which proscribes, in relevant part, "offering or giving personal service . . . or anything of value to another inmate." <u>See</u> Defs. Ex. 10.1 at 44 (NHSP <u>Manual for the Guidance of Inmates</u> (2004 ed.) ("NHSP Manual"); <u>see</u> <u>also</u> Defs. Ex. B (November 1, 2007 DR).  The undisputed evidence showed that plaintiff did help write the October 29, 2007, letter to another inmate's lawyer without the prior approval of the warden.  The hearing officer specifically found plaintiff guilty based on the November 1, 2007, DR and plaintiff's admission that he had not first obtained the warden's permission before providing the assistance.  <u>See</u> <u>id.</u> at 4. Reading Rule 16B and PPD 7.12 together, the "service" plaintiff was convicted of providing was the legal assistance with the October 29, 2007, letter, tendered without the warden's approval.

    If that were all the evidence, it might end the matter.  The evidence adduced at the preliminary injunction hearing, however, told a slightly different story.  Though plaintiff clearly did not seek or obtain pre-approval for his legal advice, the evidence showed that policy which was applied to plaintiff was not the policy which was written in PPD 7.12.  Both the incident report and the disciplinary report cite plaintiff's provision of

18

legal assistance, in violation of Rule 16B, as the basis for the
infraction, not the provision of those services without prior
approval, prohibited by PPD 7.12.  <u>See</u> Defs. Ex. A (reporting a
CI turned in "a legal document that was allegedly typed by
[plaintiff]" and that "[plaintiff] has been found and spoken to
in the past about not doing legal work for other inmates") <u>and</u>
Ex. B (11/1/07 DR reporting same).  Defendant Bilodeau testified
that plaintiff was "written up" for helping another inmate with
legal work, and that she would not have written plaintiff up for
just having typed the letter, clarifying the infracting "service"
is the provision of legal help, not the assistance with typing
the letter.  She testified that, at least once previously, she
had spoken to plaintiff about the rule against helping inmates
with their legal work.  She also testified that she had directed
other staff members to investigate and write up two other inmates
for helping with legal work.  This testimony indicated that, at
least as she understood and enforced the NHSP policy, inmate
legal assistance was totally prohibited, not that legal help was
allowed as long as permission were first obtained.

    A second NHSP staff member, defendant Kingsbury, also
testified that he believed plaintiff was doing legal work for

other inmates.  He received the initial tip that plaintiff was
involved with other inmates' legal work when a handwritten note
was left in his mail slot.  A few days later, Kingsbury found the
confiscated copy of the October 29, 2007, letter in his mail
slot.  Defendant Kingsbury testified that he immediately called
his CI to question how it might have gotten into the mailbox, and
then brought it to MCS to alert the staff members whose names
appeared on the document.  The critical issue, again, was that
plaintiff was providing the legal help, not that he had neglected
to ask the warden for permission to do so.

Finally, defendant Shaw testified that he took plaintiff's
word processor from him because it was being misused by plaintiff
to do legal work for other inmates.  The word processor was
considered contraband, because its memory could store legal work
and was being used to provide legal help.  While plaintiff is not
entitled to have a word processor, and his ownership and use of
it is a privilege which the prison can take from him if the
privilege is abused, defendant Shaw's explanation of why it
should be removed again demonstrated his erroneous understanding
that prison rules absolutely forbade doing legal work for other
inmates.  That understanding is inconsistent with PPD 7.12, which

explicitly allows an inmate to help another if pre-approval from the warden is obtained.  Defendant Shaw, like the other defendants, apparently misunderstood PPD 7.12 and believed NHSP rules forbade inmate legal assistance under all circumstances.

The policy that was understood and implemented by defendants here against plaintiff, based on the facts in the current record, was an absolute ban on inmates helping one another with legal work.  That this was the policy that was actually being enforced, as contrasted with the policy that was written, is validated by the warden's explanation for denying plaintiff's November 15, 2007, request to provide legal assistance:  "permission to give legal assistance is a violation of policy so your request to do so is denied."  Defs. Ex. E (follow-up report on plaintiff's illegal provision of legal help, quoting the warden's decision). Plaintiff had requested permission to help eight inmates who were all involved in lawsuits or were pursuing habeas petitions.  See Document no. 17, Ex. 4 (plaintiff's 11/15/07 inmate request slip seeking pre-approval to provide legal assistance).  Without considering the actual need of any one of those eight individuals to determine whether, under their particular circumstances, legal assistance was in fact needed to enable those inmates to "access

21

the courts," the warden flatly denied the request.  <u>See</u> <u>id.</u>
("Permission to give legal assistance to other inmates is a
violation of policy.  Your request to do so is denied.").

This vicious circle —— of stating that the policy requires
an inmate to first obtain the warden's permission before legal
help can be provided, and of the warden then denying permission
because it is against prison policy to allow inmates to help one
another with legal work —— creates an end-run around the
constitutional right to meaningful and effective access to the
courts.  <u>See</u> <u>Lewis</u>, 518 U.S. at 350-51 (discussing the right to
meaningful access prohibits the prison from erecting barriers
that actually interfere with prisoners' efforts to pursue their
legal claims).  While this policy arguably reflects a reasonable
understanding of the interplay between Rule 16B and PPD 7.12, as
enforced, it eliminates the warden's critical discretionary
decision-making role and creates a complete bar to an inmate
receiving legal assistance which, in some circumstances, may be
needed to ensure his fundamental right to access the courts is
not violated.

It is well-settled that the right to receive legal
assistance is a conditional right that must be justified by the

22

circumstances, and it is the prison's prerogative to determine what amalgam of materials and services to make available to inmates so they may effectively access the courts.  See Lewis, 518 U.S. at 351 (deferring to the prisons to ensure right is upheld); see also Procunier v. Martinez, 416 U.S. 396, 404 (1974) (federal courts should adopt "a broad hands-off attitude toward problems of prison administration").  The NHSP, however, must strike a balance between ensuring that the right to access the courts is meaningful and controlling the security risks and potential abuses associated with "jailhouse lawyering." Plaintiff here was punished, not because he failed to ask the warden if he could help write the October 29, 2007, letter, but because it was against prison policy to allow inmate-to-inmate legal assistance.  A prison policy that creates a blanket ban on providing any legal assistance impinges on the constitutional right of those inmates who, because they need the help, are entitled to avail them themselves of such assistance.  See Shaw 532 U.S. at 231 n.3 (citing precedent).

As enforced here, the NHSP implemented PPD 7.12 to wholly eliminate the right to receive legal assistance.  Because the blanket ban in effect at the NHSP could violate an inmate's

fundamental right to access the courts, the policy is not
reasonably related to advancing a legitimate penological interest
and cannot, therefore, justify the resulting restriction on free
speech.  See Shaw, 532 U.S. at 229-30 (citing Turner to explain
that free speech can be restricted if reasonably related to
legitimate penological interests).  Such an arbitrary rule, which
precludes any consideration of an inmate's actual need to receive
the legal advice tendered, is an excessively restrictive response
to those security concerns underlying the policy, which is
inconsistent with the First Amendment guarantees of prisoners.
See Shaw, 532 U.S. at 229 (setting forth the Turner factors
employed to evaluate the restriction on free speech).

     Based on the record before me at this early stage in the
proceedings, however, I cannot definitively conclude that
defendants were motivated by an intent to retaliate against
plaintiff when they prosecuted the November 1, 2007, DR.  The
defendants who testified said they had no knowledge of plaintiff
having filed this action when the charges were brought.  The
testimony also established that the policy on providing legal
assistance was not enforced properly.  The testimony did not
clearly establish, however, whether defendants in good-faith

misunderstood, or intentionally misapplied, the policy on
providing legal assistance.  While the chronology of events and
the unconstitutional enforcement of PPD 7.12 give rise to an
inference that an improper motive may have instigated the
November 1, 2007, charges, the evidence also demonstrates that
plaintiff in fact did not seek permission before helping write
the October 29, 2007, letter and, therefore, did violate PPD
7.12, as written.  See Nethersole, 287 F.3d at 19 (defeating
retaliation claim if defendant proves adverse treatment would
have resulted regardless of the protected conduct).  I conclude,
therefore, that plaintiff is not likely to succeed on his
retaliation claim based on the November 2007 disciplinary
proceedings, without more.

### (ii)  The November 16, 2007, Transfer to SHU

Defendants explain plaintiff was transferred to SHU on
November 16, 2007, because a CI reported that plaintiff admitted
he wanted to hurt the NHSP dentist, Dr. Anderson.  The report was
credible.  The prison found a shank and tattoo ink improperly
hidden in a recreational room which plaintiff had access to use.
Upon investigation plaintiff was cleared of the charges and
removed from SHU.  See Defs. Ex. H.  Although plaintiff may have

found his transfer to SHU and the resulting loss of privileges oppressive, that adverse treatment was directly related to a credible report of his threatening an NHSP staff member.  Because the evidence proffered justified the decisions defendant made, plaintiff's temporary placement in SHU does not support an inference of retaliatory intent that would link the adverse treatment to the filing his civil rights complaint.

###### (iii)   The January 2008 DR and Disciplinary Hearing

Defendants contend the January 11, 2008, DR and subsequent disciplinary hearing on January 22, 2008, were based on a CI report that plaintiff had threatened Duquette in the law library, not because of an intent to retaliate against him.  Whether or not plaintiff in fact made the threat, the evidence surrounding the charges and conviction is littered with sufficient factual inconsistencies directly from defendants own witnesses and records, as well as procedural irregularities which undermine the validity of plaintiff's January 2008 disciplinary conviction, to raise the strong inference of defendants' retaliatory intent to punish plaintiff at the expense of due process.

Plaintiff was charged with threatening Duquette in the law library on January 11, 2008, which plaintiff denied having done.

When the evidence did not support defendants' assertion that
plaintiff and Duquette were in the law library at the same time
on that date, defendants offered December 17, then December 20,
then some time during the week of Christmas, 2007, and then
finally sometime between plaintiff's December 20, 2007, release
from SHU and his January 11, 2008, return to SHU as possible
dates when the threat was made.[9]  Defendants failed to adduce any
evidence that substantiated the January 11, 2008, DR.  To the
contrary, defendants own evidence undermined the legitimacy of
the January 11, 2008, DR and the veracity of the CI's report by
repeatedly proffering different dates and different explanations
as to why the evidence was not consistent.

The basis for the January 11, 2008, DR was further eroded by

---

[9]The inaccuracies were remarkable.  For example, on December
17, 2007, plaintiff was still in SHU and a different inmate named
"Roy" was in the library.  Also, defendant Kingsbury testified
that he had been told plaintiff made the threat between 9 and 10
a.m. the morning of December 20, 2007, but plaintiff had not yet
been released from SHU at that time.  Then defendant Kingsbury
testified that he got a written statement from a second CI who
witnessed the threat and who "was very reluctant to give it to
me."  Defendant Kingsbury testified that the second CI statement
corroborated the January 11, 2008, report.  That statement was
produced after the hearing as a sealed exhibit.  It was dated
January 8, 2008, and was reported to defendants on January 10,
2008.  If defendant Kingsbury in fact had gotten the second CI
statement to confirm the January 11 report, the date of that
statement would have had to have been January 11, 2008, or later,
not January 8 or 10, 2008, as reflected in the sealed exhibit.

defendants' handling of plaintiff's request for witnesses at the disciplinary hearing.  Defendants explained that his request for witnesses had been lost.  At the hearing on January 22, 2008, when plaintiff inquired about the absence of his witnesses, the hearing officer ignored plaintiff's appropriate request and refused to adjourn the hearing to enable plaintiff to present his evidence.  Instead, he proceeded to consider the charges with only plaintiff's story to offset the prison's CI statement, the DR and the administrative investigation.

These facts demonstrate that the NHSP failed to follow its own procedures when it found plaintiff guilty of the charged threat.  See PPD 5.25 (establishing procedures governing the processing of inmate rule violations).  The NHSP procedures place the responsibility on defendants to "obtain a list of witnesses from the inmate" and "ensure that evidence is safeguarded."  PPD 5.25, IV, C, ¶ 3, f & g.  The procedures require the inmate to provide his witness list to the hearing officer within 24 hours of the hearing, and allow the hearing officer to exclude certain evidence after explaining his reasons for the exclusion on the record.  See PPD 5.25, IV, D, ¶ 5.  The hearing officer may also postpone the hearing "for good cause."  Id., ¶ 4.  Since

28

plaintiff was being held in SHU, postponing the hearing to enable plaintiff's witnesses to be present would not have presented any security risks, would have provided plaintiff with some measure of due process, and more importantly, would have substantiated the hearing officer's finding that the threat in fact had been lodged.  See Hartsfield v. Nichols, 511 F.3d 826, 830 (8th Cir. 2008) (citing Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974) procedural suggestions to ensure the fact-finding role of the hearing).

As defendants are presumed to know their own procedures and circumstances, the decision to proceed with the January 22 hearing without giving plaintiff an opportunity to present evidence in his defense, and not recording any explanation as to why such evidence was excluded, was, at a minimum, inexcusably careless and certainly grossly unfair.  After considering all the evidence of record, I find it is reasonable to infer that the object of the disciplinary process in this instance was not to impose legitimate punishment, but to retaliate against plaintiff because of his antagonistic relationship with some of the defendants, including his pending lawsuit.  The fact that defendants could not adduce any evidence at the preliminary

injunction hearing to support the charged offense further renders the January 22, 2008, hearing results without any basis.

While violations of internal disciplinary procedures that do not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin v. Connor, 515 U.S. 472, 484 (1995) do not violate the due process clause, the procedural irregularities that occurred here raise a substantial inference that defendants were motivated by an intent to retaliate against plaintiff rather than justifiably punish him.  Cf. Hartsfield, 511 F.3d at 830–31 (discussing when the disciplinary charges or process may evidence retaliation but finding evidence showed inmate had violated a prison rule). While defendants may ultimately be able to prove that plaintiff in fact made the threat, nothing in the current record shows with any certainty when, or if, the threat was made.  The hastiness with which defendants suggested alternative dates to the initially charged January 11, 2008, date wholly undermined their case and credibility.

When that process is seen in the context of the November 2007 disciplinary proceeding for the improper provision of legal services, a pattern of retaliation begins to emerge.  While I

30

found defendants Bilodeau and Shaw to be credible witnesses who
appeared to have had a good-faith, albeit mistaken, understanding
of the policy governing the provision of legal services,
defendant Kingsbury's testimony was inconsistent, self-serving
and not credible, and the role of Duquette also looms large.  The
paucity of credible evidence to support the January 2008
conviction, which involved both defendant Kingsbury and inmate
Duquette, renders their involvement in the November 2007
conviction more suspect.  Based on the record before me at this
time and the chronology of events from plaintiff's October 2007
filing of this civil rights action, I find defendants' punishment
of plaintiff would deter an inmate of ordinary firmness from
exercising his fundamental right to access the courts, and
demonstrates that plaintiff is likely to succeed in his
retaliation claim.

### 4.   Other Preliminary Injunction Factors

Because plaintiff may succeed in his retaliation claim based
on the November 2007 and the January 2008 disciplinary charges,
the remaining factors that justify a preliminary injunction
become relevant.  Injury to constitutional rights is not
typically adequately compensated by money damages, and free

speech violations are generally sufficient to prove irreparable harm. See Verizon New Eng., Inc. v. Me. PUC, 403 F. Supp. 2d 96, 105–06 (D. Me. 2005) (citing authority), aff'd in part, rev'd in part on other grounds, 509 F.3d 1 (1st Cir. 2007); see also Hannon v. Allen, 241 F. Supp. 2d 71, 78 (D. Mass. 2003) (temporary loss of constitutional right may be a form of irreparable harm). Both the public interest and the equities favor requiring the NHSP to administer its rules and policies in a constitutionally effective manner. PPD 7.12 can be enforced as written, to ensure the warden makes the critical determinations about when legal assistance is justified and how it may be provided. Moreover, disciplinary hearings can be run, and no doubt generally are run, according to PPD 5.25 and those other procedures necessary to ensure the integrity of the disciplinary process. On the record before me, I find these factors favor awarding the preliminary injunction.

### Conclusion

As explained in detail above, I find that plaintiff has substantiated his retaliation claim. I, therefore, recommend that plaintiff's request for preliminary injunctive relief, pending final disposition of this matter, be granted, as follows:

(1)   I recommend that the disciplinary violation determination made following the January 22, 2008, disciplinary hearing be expunged from plaintiff's record, because the charge and the findings were not supported by any credible evidence, but were retaliatory.

(2)   I further recommend that plaintiff be reinstated to MCS if he has not yet been transferred there, because the record reflects his placement in the Hancock Building was based on his record of two rule violations, one of which is no longer valid. The January 2008 disciplinary proceedings were retaliatory, and any record of it, therefore, should be expunged.

(3)   Finally, I recommend that plaintiff be reinstated to hobby craft, because his six month suspension from that privilege based on the November 1, 2007, DR has passed.

As plaintiff has already resumed working, his request to return to work is moot.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13–14 (1st Cir. 1992);

33

United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge


Date:   June 13, 2008

cc:   Steven Roy, pro se
      Danielle L. Pacik, Esq.